*184 To A PETITION FOR RE-HEABING PRESENTED BY THE COUNSEL FOR APPELLEE, delivered the following response:
JUDGE WILLIAMS
We remark at the outset that all the records, papers, &c., used on the trial of Tompert, as mayor, before the board of aldermen, were introduced as evidence in this case by appellee, over the objections of appellant; therefore, he cannot now object to its being considered, or to the result thereby produced.
This record proves precisely this state of facts :
October 26, 1865, the common council rejected the proposition of Isham Henderson and associates to build a street railway through Market and other streets of Louisville, by a vote of ten ayes to twelve nays; that November 9, 1865, this vote of rejection was reconsidered, and Henderson’s proposition accepted by a vote of twelve ayes to nine nays.
The resolution authorizing the mayor to execute and sign the contract was then passed.
November 16, 1865, the mayor’s written objections to said resolution were received and considered, and the resolution again adopted, his objections to the contrary notwithstanding, by a vote of thirteen ayes to ten nays— Mr. Glore, in every instance, having voting to make the contract, to adopt the resolution, and to sustain it over the mayor’s veto.
December 5, 1865, the mayor seiiit to the council his message, accompanied with two affidavits, charging that Glore had received a bribe to sustain the said contract. In this message he says:
“ I deem it due to the council and the citizens of Louisville to have the matter presented to the council for investigation before completing the contract, believing, as I do, that the council will deem it due to their body to *185 purge it of corruption and venality in properly regarding the interests of the citizens of Louisville which have been intrusted to their keeping. I am ready to submit to the council the affidavits which impeach one of the members Of your body in this transaction when called upon, and am prepared to furnish the names of several additional citizens, who, I am informed, are also cognizant of the facts, and are ready to testify before your body.; and I therefore respectfully submit the information before executing said contract, as a reason for its non-execution. I would further respectfully submit, that when a member of your body receives a consideration for his support of any project pending before your body, he becomes a party in interest, and under the charter would not have a vote; and that in this case, if such vote is excluded, the said resolution has not received the requisite vote to pass it over my veto.”
This message, instead of being considered, and the charges preferred against Glore inquired into, was tabled by a vote of fourteen ayes to seven nays, he voting in the affirmative; and immediately the charge and specification against the mayor for failing to discharge the duties of his office in not executing said contract was preferred and sustained by a vote of thirteen ayes to ten nays, Glore voting in the affirmative.
December 28th, 1865, “Mr. Dulany presented a resolution raising a joint session this evening at 8 o’clock, to elect a councilman from seventh ward, in place of N. 8. Glore, expelled, and to elect a mayor for the un expired term of Philip Tompert, deposed from office; which was .adopted.” We have now given the exact history of this case, that its precise status and the principles of law applicable to it may be appreciated.
But it is insisted that the evidence shows that Joseph Clements was a justice of the peace of Jefferson county, *186 because Lucas states that eleven of the board of aider-men were sworn by “ Joseph Clements, Esq., J. P., J. C.” Now we will not stop to discuss this proposition, nor to show that the official signature is a very different thing from the statements of a witness; because, if it be conceded that Clements was a justice of the peace, still there is no evidence that Crow, who constituted one of the court, was ever sworn by him. True, Crow himself stated that such was the case; but the board of aldermen very properly refused to receive this as evidence; hence, they determined that the whole twelve should be sworn before the notary public; and it was under this latter oath they really organized and proceeded as a court. And this was the true reason why said board determined to be again sworn; regarding the oath administered to the eleven, and Crow’s report of his being sworn, as being insufficient for them to proceed as a court; and we concur with them.
Had these gentlemen been indicted for malfeasance in office under this Clements oath, we have no doubt that, if the facts appearing in this case had been established in a trial on such indictment, that the court would, as he should, have instructed the jury that the refusal to organize under the oath administered by Clements, and the taking another before the notary, was an abandonment of the first oath, and to acquit the parties.
The judge who tried the case does not seem to differ from us as to the law; for, in the opinion, he says: “ If the judgment of the board of aldermen was so informal and irregular as to be null and void, then no vacancy existed at the time of defendant’s election.”
We suppose he means if the proceedings were so irregular, and not the mere form of the judgment. It was therefore not upon the law, but the fact of such *187 irregularity, that the difference is founded; for he evidently did not so regard the proceedings, whilst we do, for the reasons assigned.
It is said again that appellee could have proven on said trial that appellant not only refused to sign the contract, “ but also, among other gross delinquencies and official misbehavior, that, when he sent in his second message, he made a violent and abusive speech in the presence of, and to the council; and declared, in so many words ‘that they had stultified themselves — that he would not sign the contract, and would make them swallow their lies ? ” but the court would not allow this, and therefore a modification should be so made as merely to direct a new trial.
The court very properly so ruled, because there was no charge or specification which authorized the board of aldermen to receive such evidence. The only charge and specification was for official delinquency in not executing said contract with Henderson and his associates; and, were the case now.sent back for a new trial, this evidence would be wholly inadmissible.
Then the charge and specification were for not executing this contract. Did the charge and specification, founded on the official proceedings of the common council and aldermen and mayor, show that his conduct was illegal ?
Express power is given the mayor by the 15th section, city charter, to charge any officer. He made a charge of official corruption against one of the common council, and gives that as a reason why the contract should not then be executed. Instead of investigating this charge, the common council tabled his message and charge, and received the votes of the councilman thus charged in aid thereof, and then immediately charged the mayor for offi *188 cial delinquency in not executing this contract, which was not authorized, only by counting the vote of this same councilman; and then, having procured the expulsion of the mayor by his vote, expelled this same councilman.
If this most extraordinary proceeding does not conclusively show corruption and fraud, it certainly does conclusively show that the mayor was acting in good faith to protect the public interest of the city, and was in the legal discharge of his duties. And to say that it is the right of the common council to charge, and the board of alderman to expel, the mayor on charges made at their arbitrary will and pleasure, without legal cause, is an utter absurdity.
If it be granted that the common council may prefer charges, and that the board of aldermen may tiy the same and expel the mayor from office, this can only be done for illegal official delinquency, in accordance with, and subordination to, law; and is not an arbitrary, despotic, and absolute power to do so at their own will and pleasure.
Whilst purity, integrity, and honesty shall be regarded as cardinal principles of public virtue, public morality, and public justice, no case bearing the indelible impress and characteristics of this, can ever address itself imposingly to the favorable consideration and discretion of a court of justice.
But it is again said that the public will be involved in confusion and litigation unless Lithgow be regarded as the rightful mayor. Without intending to decide any litigation which may grow out of these acts, we may be indulged in saying, we apprehend no such calamitous consequences; for this oourt has often recognized the validity of the acts of the officer de facto, as between *189 third parties, and in Stokes vs. Kirkpatrick (1 Met., 138), reviewed and reaffirmed this doctrine.
But if it should be otherwise, it is not the fault of the law or its courts, and should admonish impeaching tribunals that it is an extraordinary power, and should always be cautiously exercised, and never for any other than the gravest legal causes.
It may be remarked, that, in all this cause, not even the suspicion of the least impropriety is to be found against Lithgow. He only accepted the office after it was declared vacant, at the hands Of the general council, and afterwards by an election of the people. But, as there was no legal vacancy, both of his elections were illegal, and he must therefore surrender the office.